ADAM L. BRAVERMAN
United States Attorney
RYAN R. CROSSWELL
Assistant U.S. Attorney
North Carolina Bar No. 36700
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
Tel:  (619) 546-9661
Email:  ryan.crosswell@usdoj.gov

Attorneys for the United States of America

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KARINA LIZETH RAMIREZ,<br><br>Defendant. | Case No. 3:17-cr-03955-LAB<br>Related Case No. 3:17-cr-02574-LAB<br><br>**UNITED STATES' TRIAL MEMORANDUM**<br><br>The Honorable Larry A. Burns<br><br>DATE: January 23, 2018<br>TIME: 9:00 a.m. |

Karina Lizbeth Ramirez is charged in a two-count indictment with importing methamphetamine and conspiracy to import methamphetamine.  The Government submits this Trial Memorandum to provide the Court with pertinent facts and law related to the case.

## I

## STATEMENT OF THE CASE

**A.  Information**

On August 1, 2017, Defendant Karina Ramirez ("Defendant") was arrested on a charge of importation of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 952 and 960.  ECF No. 1.  Defendant waived

indictment and was arraigned on a single count Information charging her with violating Title 21, United States Code, Sections 952 and 960, on August 31st.  ECF Nos. 12–14.

**B.     Indictment**

On November 21st, the Government indicted Defendant on charges of importing methamphetamine and conspiracy to import methamphetamine.  No. 17-cr-03955, ECF No. 1.  Defendant was arraigned on the Indictment on November 30th.  ECF No. 6.

**C.     Trial Status**

A jury trial is set for January 23, 2018 at 9:00 a.m. before the Honorable Larry A. Burns.  The Government anticipates its case-in-chief to last between 1–2 days.

**D.     Defense Counsel**

Defendant is represented by appointed counsel Ricardo Gonzalez.

**E.     Custody Status**

Defendant is released on bond.

**F.     Interpreter**

Defendant speaks English, but may request a Spanish language interpreter.  None of the Government's witnesses require an interpreter.

**G.     Jury Waiver**

Defendant has not filed a jury waiver.

**H.     Pretrial Motions**

On September 18, 2017, Defendant filed Motions to Compel Discovery and for Leave to File Further Motions.  ECF No. 15.  The Government its Response in Opposition on October 3, 2017.  ECF No. 16.  At the motion hearing on October 10, 2017, the Court ordered the Government to provide Defendant the results of its cell phone search warrant no later than October 20, 2017.  ECF No. 17.  The Government has complied with this order.

On November 27th, the Government filed its Motions *in Limine* to (1) admit expert testimony; (2) allow the drugs in the courtroom; (3) exclude witnesses except the case agent from the courtroom; (4) preclude evidence of duress or necessity; (5) preclude evidence

not previously produced and noticed; (5) preclude reference to Defendant's health, age, finances, education, and potential punishment; (6) preclude character evidence; (7) preclude Defendant from offering expert testimony; (8) admit TECS border crossing records; (9) admit evidence without establishing full chain of custody; and (10) renewed motion for reciprocal discovery. No. 17-cr-03955, ECF No. 7.

On December 8th, Defendant filed a Motion to Dismiss Count 1 of the Indictment and a Motion to Compel Discovery on December 8th. ECF No. 15. The Government filed its Response in Opposition to both on December 15th. On December 18th, the Court held a hearing on Defendant's Motion to Dismiss and denied it. ECF No. 20.

On January 12, 2018, Defendant filed her Motion *in limine* (1) to admit defense expert witness; (2) to exclude hearsay from witnesses; (3) to exclude information from jury room; (4) to exclude Federal Rule of Evidence 410(a) evidence; (5) to exclude the drugs and packaging in the courtroom; (6) to allow attorney voir dire of jury; (7) to exclude financial distress evidence; (8) for order production of grand jury transcripts; and (9) to admit character witness evidence. ECF No. 24.

On January 16th, the Government filed its Motion *in Limine* to exclude Defendant's expert testimony regarding "blind mules." ECF No. 25. The Motions *in Limine* will be heard on January 22nd.

### H. Stipulations

The Government has proposed two stipulations. First, the drugs seized were 4.34 kilograms of methamphetamine (actual). Second, a warrant was issued to search the contents of the gold Samsung Galaxy S7 seized from Defendant at the time of her arrest, a forensic analysis was properly performed, and the results of the analysis accurately reflect the contents of the phone as of the date of Defendant's arrest. The parties have discussed these stipulations but have not yet come to a final agreement.

### I. Discovery

The Government produced the following:
- relevant documents bates labeled 0001–0509

- a video recording of Defendant's post-arrest statement and an audio recording of Defendant's November 2, 2017 proffer
- information in the Government's possession regarding Mexican drug trafficking organizations' use of certain kinds of couriers (the "drug courier discovery")
- video of defendant's car entering the pre-primary and primary inspection area at the San Ysidro Port of Entry on August 1, 2017
- evidence seized from defendant's cell phone pursuant to its search warrant.

The Government has complied and continues to comply with its discovery obligations. The Government has not yet received any reciprocal discovery.

## II

## STATEMENT OF FACTS

### A. Officers find 4.34 kilograms of methamphetamine hidden within defendant's rear bumper

On August 1, 2017, at approximately 11:43 p.m., Defendant was driver and sole occupant of a 2007 Toyota Corolla, bearing California license plates (the "Vehicle"), as it approached the primary inspection booth at the San Ysidro Port of Entry. A U.S. Customs and Border Protection Officer ("CBPO") and his trained Human Narcotics Detection Dog ("HNDD") were conducting pre-primary roving inspections during this time. The HNDD alerted to the rear bumper of Defendant's car.

The CBPO approached the driver's side window to talk to Defendant. During their brief conversation, several aspects of her demeanor stood out to him. She was not making eye contact with him. She gripped her cell phone in an unusual way, almost as if she wanted to put it down but couldn't. She was giving unusually quick answers to his questions. The CBPO instructed Defendant to put the Vehicle in park and hand him the keys. He then inspected her rear bumper, where is HNDD alerted.

A second CBPO approached Defendant's car, now parked in the lane in the pre-primary section of the Port of Entry. He asked Defendant if anyone else had access to her

car. Defendant responded that she had her oil changed and the air in her tires checked in Chula Vista. She never mentioned that she had any service done to the car in Mexico that night.

Defendant was escorted to the security office and the Vehicle was referred to secondary inspection. After a Z-Portal machine detected anomalies, a CBPO conducted a physical inspection of the Vehicle and noticed a non-factory compartment, with foam and black spray paint concealing gaps. The CBPO removed the bumper and discovered ten (10) packages that contained a total of 4.34 kilograms of methamphetamine.

B.   **Defendant's post-*Miranda* statement**

Two Homeland Security Investigations ("HSI") Special Agents *Mirandized* Defendant, she agreed to speak with them. Now aware that the CBPOs found narcotics in her car, she told the agents that she traveled to Mexico on August 1st at approximately 5:00 p.m. to have the Vehicle's car stereo, mirror, and tires repaired by a friend of a friend named "Miguel." Defendant claimed that Miguel's "employees" took the Vehicle from her to take it somewhere to conduct the repairs. In the meantime, Defendant said that she travelled to a friend's house and did laundry while she waited for the Vehicle to be ready. Later that night, Miguel returned the Vehicle to Defendant.

After being informed by agents that "Miguelon TJ" called her cellular phone multiple times since her arrest, Defendant revealed for the first time – nearly 50 minutes into the interview – that Miguel was calling to ask Defendant to meet his cousin in the United States to pick up an unspecified amount of currency from him and deliver it back to him in Mexico. Defendant claimed she agreed to this arrangement and intended to deliver the currency the next day or two, though she did not know where she was going to meet Miguel's cousin or how much currency she was supposed to retrieve.

Additionally, Defendant was in possession of 971 dollars and 3,210 pesos at the time of her arrest. When questioned about this money, Defendant answered that she had it to purchase a cashier's check to pay her monthly rent. Subsequent investigation revealed that

she had already paid her rent for the month by personal check on August 1st, at some point before crossing into Mexico.

## C.  Defendant's November 2, 2017 unprotected proffer

On November 2, 2017, Defendant, her counsel, and an investigator, came to the United States Attorney's Office and conducted a proffer. Defendant and her counsel were explicitly advised at the beginning of the proffer that the interview was being conducted at the request of her and her counsel, and it was not part of any ongoing plea negotiations with the Government. Further, Defendant and her attorney were explicitly advised that, should the case proceed to trial, the Government would seek to use her statement in either its case-in-chief or for impeachment purposes.

During the proffer, Defendant said, for the first time, that she actually was introduced to Miguel weeks earlier, in May. Defendant claimed that Miguel asked her to help transport money from his appliance businesses in the United States into Mexico. In return for her efforts, Miguel was supposed to help Defendant by repairing her car. Defendant claims she made 5–6 trips to pick up money for Miguel, but was not certain of the exact number. She claimed that she would drive to general areas in Riverside or San Bernardino County and then call Miguel when she arrived at the pickup location. An individual would then arrive and hand her money and sometimes cell phones, often packaged in a box. Defendant never had direct contact with the people she met.

She claimed that she turned the Vehicle over to Miguel in Mexico before her previous trip to the United States. She stated that Miguel kept the Vehicle for a couple of days and she was unable to contact him to get it back. She said this was "eerie." During the next trip to the United States, she claimed that Miguel asked her to drive to San Bernardino to meet someone she knew only as "Prima." She claimed that she turned her Vehicle over to Prima so Miguel could make sure Defendant was not trying to take his money. When asked how turning the car over would ensure she was not trying to take Miguel's money, she conceded that it did not make sense although she thought it may have been to make sure she was not a police officer.

Defendant initially claimed that it would cost her approximately $40-50 in gas to drive her Vehicle, but she only received compensation on two occasions. One time Miguel paid her $300 and another he paid her approximately $100 to cover her food and gas expenses. Defendant later changed her story to indicate that Miguel gave her close to $900 on another occasion, and then again to add that Miguel gave her $1000 on another occasions. Towards the end of the interview, after being admonished by her defense counsel to clarify anything she had minimized because of her fears, Defendant stated that before her arrest, she was transporting money from out of the United States for Miguel's uncle. Defendant described Miguel's uncle as "a big honcho" in Tijuana, and connected to either the police or a drug cartel. She also described him as a "dangerous guy in TJ." Defendant stated that Miguel approached her about a "business proposition" in which she would be transporting a "big load" of money. When asked if the money that she would be transporting belonged to Miguel's uncle, who was "a big honcho and possibly a narco," she responded, "yes." When asked if she thought "all this was legitimate money for legitimate businesses that you were involved," she impliedly admitted it was not, responding, "Not until I really thought about it. That's when -- I don't want to do it anymore."

**D. Defendant's unusually agitated demeanor at work in days leading up to her arrest**

Following her arrest, an HSO agent interviewed Shannon Smith, who, along with Defendant, is a Co-Manager of the Wal-Mart in Chula Vista. Mr. Smith reported that in the days before her arrest, Defendant was unusually irritable and on-edge at work. At one point, Defendant threw her phone. Mr. Smith, who has worked with Defendant for three years, had never seen her behave in such a manner.

## III.

## WITNESSES

The Government expects to call the following witnesses in its case-in-chief, but reserves the right to call fewer or more witnesses, as necessary.

1.  CBP Officer Grijalva

2. CBP Officer Olfato
3. CBP Officer Jesse Garcia
4. HSI Special Agent Keith Banks
5. HSI Special Agent Andrew Flood
6. HSI Special Agent Kimberly Hesse
7. DEA Forensic Chemist Layne Higgins
8. Automotive Expert John Louie
9. Violet Stone, Manager of Windsong Apartment
10. Shannon Smith, Co-Manager, Wal-Mart (Chula Vista)
11. HSI Cell Phone Forensic Examiner David Marshall

## IV.
## EXHIBITS

The Government will provide a complete exhibit list prior to trial. The Government requests that defense counsel examine the exhibits before trial and also requests time to examine the defense exhibits before trial in order to expedite the proceedings. The Government currently intends to offer the following into evidence (not listed in order by number):

1. Photos of Defendant's car taken on the night of her arrest
2. The methamphetamine and photos of the methamphetamine found in Defendant's car
3. Text messages and photos extracted from Defendant's phone
4. A call log from Defendant's phone
5. A copy of Defendant's rent check dated August 1, 2017, and a ledger from her apartment demonstrating the check was deposited the same day
6. Audio recordings of Defendant's post-*Miranda* statement and her unprotected proffer session
7. TECS border crossing records

# V.
# APPLICABLE LAW

### A. Conspiracy to Import Methamphetamine - 21 U.S.C. §§ 952, 960, and 963

The Government must prove beyond a reasonable doubt:

1. Beginning at a date unknown to the grand jury and continuing up to and including August 1, 2017, there was an agreement between two or more persons to import methamphetamine or some other federally controlled substance; and
2. the defendant joined in the agreement knowing of its purpose and intending to accomplish that purpose.

"[S]ection 963 does not require proof of an overt act in furtherance of the conspiracy." *United States v. Montgomery*, 150 F.3d 983, 998 (9th Cir. 1998).

With regard to the first element, an "[a]greement may be shown by evidence of coordinated activity between the defendant and the alleged coconspirators." *United States v. Mesa-Farias*, 53 F.3d 258, 260 (9th Cir. 1995). "Once the existence of a conspiracy is established, evidence of only a slight connection is necessary to support a conviction of knowing participation in that conspiracy. *United States v. Sanchez-Mata*, 925 F.2d 1166, 1167 (9th Cir. 1991).

With regard to the second element, "[i]t is well-established in this circuit that the requisite intent necessary to commit [the] underlying, substantive offense, is an essential element of any conspiracy." *United States v. Kim*, 65 F.3d 123, 126 (9th Cir. 1995) (internal citations omitted). "To be convicted under 21 U.S.C. § 952, a person must knowingly import a controlled substance." *United States v. Ramos-Atondo*, 732 F.3d 1113, 1119 (9th Cir. 2013). "It does not matter whether the defendant knew that the substance was methamphetamine. It is sufficient that the defendant knew that it was some kind of prohibited drug." 9th Cir. Model Crim. Jury Instructions 9.32 (Controlled Subtance – Unlawful Importation (2017)).[1]

---

[1] *See also United States v. Salazar*, 5 F.3d 445, 446 (9th Cir. 1993) (defendant, who pled guilty to conspiracy charge, was "responsible for the drugs that came through, even if he did not know what drugs they were"); *United States v. Mendez*, 534

"The government does not have to present direct evidence. Circumstantial evidence and the inferences drawn from that evidence will sustain a conspiracy conviction." *United States v. Castro*, 972 F.2d 1107, 1110 (9th Cir. 1992). It is not necessary for the government to show that the defendant knew "the exact scope of the conspiracy, the identity and role of each of the co-conspirators, or the details of the operations or any particular plan." *United States v. Thomas*, 586 F.2d 123, 132 (9th Cir. 1978).

### B. Importation of Methamphetamine - 21 U.S.C. §§ 952 and 960

The Government must prove beyond a reasonable doubt:

1. the defendant knowingly brought methamphetamine into the United States from a place outside the United States; and
2. the defendant knew the substance he was bringing into the United States was methamphetamine or some other federally controlled substance. 9th Cir. Model Crim. Jury Instructions 9.32 (2017).

"It does not matter whether the defendant knew that the substance was methamphetamine. It is sufficient that the defendant knew that it was some kind of prohibited drug." *Id.*

### C. Deliberate Ignorance

"Deliberate ignorance involves "(1) a subjective belief that there is a high probability a fact exists and (2) deliberate actions taken to avoid learning the truth." *United States v. Yi*, 704 F.3d 800, 804 (9th Cir. 2013). "[A] district court may give a deliberate ignorance instruction if it determines that a jury could rationally find deliberate ignorance, even if the jury had rejected the government's evidence of actual knowledge." *United States v. Ramos-Atondo*, 732 F.3d 1113, 1119 (9th Cir. 2013). Where a defendant "dispute[s] [her] actual knowledge, the government [is] entitled to instructions supporting

---

Fed. Appx. 585, *586 (9th Cir. 2013)(unpublished)(citing *Salazar*, *ibid.*, in affirming conviction for conspiracy to distribute methamphetamine); *Cf.* "[A] reasonable fact-finder could conclude that [the defendant] knew he was carrying a controlled substance and that he was doing so in agreement with other people." *United States v. Garcia*, 317 Fed. Appx. 632, 634 (9th Cir. 2008)(unpublished).

all rational inferences the jury might draw from the evidence." *Id.* (internal citations omitted).

Defendant admitted that 1) she was transporting money for a man who was possibly "cartel" and a "dangerous guy in TJ," and 2) people were hiding the money in her car, so that she did not know how much. When asked, "So you knew he was putting things in your car and you were driving across the border with it?", Defendant answered, "From San Bernadino to TJ." When probed as to whether she asked any questions, Defendant responded, "I did. I was told it was just going to be money." She was then asked, "And you thought that this was – at that point, did you think this is legitimate, he's running a legitimate business that he's hiding money in your car when you're crossing," she responded, "That's why I didn't – I don't want to do it anymore." If the Government presents this evidence at trial, a *Jewell* instruction is appropriate. *See United States v. Nicholson*, 677 F.2d 706, 708 (9th Cir. 1982) (*Jewell* instruction appropriate where defendant invested $20,000 with a man he knew to be involved in marijuana smuggling business but did not ask how the money was to be used."). And even though Defendant claims to have asked questions, "a judge and jury reasonably could [choose] to disbelieve this uncorroborated, self-serving statement." *Id.*

### D. False Exculpatory Statements

The Ninth Circuit has repeatedly held that false exculpatory statements may be admissible as circumstantial evidence tending to show consciousness of guilt. *See United States v. Candoli*, 870 F.2d 496, 508 (9th Cir. 1989); *United States v. Hackett*, 638 F.2d 1179, 1186-87 (9th Cir. 1980), *cert. denied*, 450 U.S. 1001 (1981); *United States v. Boekelman*, 594 F.2d 1238, 1240 (9th Cir. 1978); *United States v. Wood*, 550 F.2d 435, 442-43 (9th Cir. 1977).

The Government intends to offer evidence of numerous false exculpatory statements made by Defendant during her interviews, including why she had over $1100 in currency (including pesos) and the extent of her relationship with "Miguel." Her false statements are probative of her knowledge that she had methamphetamine hidden in her

car because they demonstrate a guilty conscious.  They show that Defendant knew she had something to hide.

### E. Evidence of a Defendant Living Beyond Her Means in a Case Involving Financial Gain

"Evidence that tends to show that the defendant is living beyond his means is of probative value in a case involving a crime resulting in financial gain." *United States v. Saniti*, 604 F.2d 603, 604 (9th Cir.) (per curiam), *cert. denied*, 444 U.S. 969 (1979); *see also United States v. Feldman*, 788 F.2d 544, 557 (9th Cir. 1986) (evidence showed that defendant owed substantial sums of money), *cert. denied*, 479 U.S. 1067 (1987); *United States v. Reed*, 639 F.2d 896, 907 (2d Cir. 1981) (defendant was eight months behind in mortgage payments); *United States v. Gorel*, 622 F.2d 100, 105 (5th Cir. 1979)  (defendant lost $ 41,000 in an unsuccessful investment), *cert. denied*,  445 U.S. 943, (1980).

Defendant has stated during her interviews that she is in debt and has "horrible credit."  Though the Government does not intend to offer this evidence during its case-in-chief, if Defendant contests motive to commit the charged conduct, the Government should be able to impeach or rebut Defendant or her witnesses with this evidence that Defendant was living beyond her means.

### F. Demeanor Evidence

Evidence regarding a defendant's demeanor and physical appearance is admissible as circumstantial evidence that is helpful to the jury's determination as to whether a defendant knew drugs were concealed in the vehicle.  *See United States v. Hursh*, 217 F.3d 761 (9th Cir. 2000) (holding that a jury may consider a defendant's nervousness during questioning at Calexico POE); *United States v. Fuentes Cariaga*, 209 F.3d 1140, 1144 (9th Cir. 2000) (holding that it is within the ordinary province of jurors to draw inferences from an undisputed fact such as a defendant's nervousness at Calexico POE); *United States v. Barbosa*, 906 F.2d 1366, 1368 (9th Cir. 1990) (holding that a jury could infer guilty knowledge from a defendant's apparent nervousness and anxiety during

airport inspection); *United States v. Lui*, 941 F.2d 844, 848 n.2 (9th Cir. 1991) (holding that a jury could consider guilty knowledge from a defendant's acting disinterested during airport inspection).

A lay witness may state his opinion that a defendant appeared nervous. "While the older view might preclude witnesses from giving their 'opinion' on whether a particular person appeared nervous or intoxicated, under the modern, and probably majority, view a lay witness may state his opinion that a person appeared nervous or intoxicated." *United States v. Mastberg*, 503 F.2d 465, 470 (9th Cir. 1974); *see also United States v. Beas*, 612 F. App'x 482 (9th Cir. 2015)(unpublished)(holding that the primary officer's impression that the defendant was nervous and posed a potential safety risk was permissible lay opinion and tended to prove knowledge), *cert. denied*, 136 S. Ct. 1480 (2016); *United States v. Sandobal*, 1 F. App'x 735, 736 (9th Cir. 2001)(unpublished)(Trooper's testimony in suppression hearing that motorist was "unusually nervous" during traffic stop was permissible lay opinion.)

Here, witnesses for the Government may testify to Defendant's nervous demeanor when stopped at the San Ysidro Port of Entry and her uncharacteristically anxious behavior at work in the days leading up to her arrest. Her demeanor and anxiousness constitute circumstantial evidence of her knowledge that she was importing a controlled substance.

### G. Accuracy Of Google Maps

In *United States v. Perea-Rey*, the court took judicial notice of a Google Map as a "source[ ] whose accuracy cannot reasonably be questioned." 680 F.3d 1179, n.1 (9th Cir. 2012).

Here, the United States intends to introduce a Google Map showing several locations of Defendant's phone on certain dates, which were automatically generated by Google map after an agent entered latitude and longitude coordinates from the phone's location data. Additionally, the automatically generated tacks on the map marking the locations are not hearsay. *See United States v. Lizarraga-Tirado*, 789 F.3d 1107, 1109-

10 (9th Cir 2015) (holding that Google Earth satellite images and digital tacks labeled with GPS coordinates were not hearsay).

### G. Guilt-Assuming Questions of Admitted Facts

Generally, it is improper for prosecutors to ask hypothetical questions of character witnesses that assume the defendant's guilt for the actions being tried. *See United States v. Schwayder*, 312 F.3d 1109, 1121 (9th Cir. 2002), *cert. denied*, 539 U.S. 944 (2003). However, the Ninth Circuit Court of Appeals has recognized an exception to this rule where facts have been admitted by the defense. In *United States v. Velasquez*, the Court held that it was permissible for Government to ask character witnesses whether walking into a bank with a grenade was a violent act. 980 F.2d 1275, 1277 (9th Cir. 1992). The question only assumed facts that the defense counsel presented in his opening statement. *Id.*

Here, Defendant herself has already made numerous admissions, including that she thought she was smuggling money for a "dangerous guy in TJ", who was "possibly a narco." Defendant has indicated her intention to introduce character evidence. If she does, the Government should be allowed to probe the witnesses' knowledge of Defendant's smuggling activities, because such questions are based on actions for which Defendant herself has admitted involvement.

## VI.
## PROPOSED VOIR DIRE

1. The law requires the government to prove its case against the defendant beyond a reasonable doubt. If you are selected, would you want the government to prove its case by a higher standard of proof, say beyond all doubt?
2. The evidence presented may be direct or circumstantial. By way of example, direct evidence that it rained last night would be an eyewitness saying that he saw it rain, and circumstantial evidence would be that the next morning, the ground was wet. The law makes no distinction between direct and circumstantial evidence.

1  Would any of you have trouble convicting a defendant against whom the
2  government presented only circumstantial evidence?
3  3. Does anyone have any personal beliefs that would prevent them from standing in
4  judgment of another human being or making a decision about guilt or innocence,
5  regardless of the strength of the evidence?
6  4. Has anyone had any disputes or unpleasant experiences with law enforcement?
7  Does anyone have strong feelings about the Customs and Border Protection or the
8  Department of Homeland Security (Homeland Security Investigations), or the
9  Drug Enforcement Administration?
10 5. Does everyone understand that as a juror your duty is to apply the law regardless of
11 whether you agree with it?
12 6. Defendant in this case is charged with conspiracy to import methamphetamine and
13 unlawful importation of methamphetamine.  Does anybody have strong feelings or
14 opinions about U.S. drug laws that would prevent him/her from viewing the
15 evidence impartially?  Has anyone been a member of an organization involved in
16 advocating for the legalization of drugs? Regardless of any position you may have
17 regarding the legalization or criminalization of cocaine, if you become a juror on
18 this trial, will you be able to follow the current federal law of the United States as
19 instructed by the judge?
20 7. You may hear evidence that drugs were discovered at the San Ysidro Port of Entry,
21 just beyond the international border between the United States and Mexico but in
22 the territory of the United States.  Do any of you think that it should not be a crime
23 when drugs are brought into the United States but do not make it past the Port of
24 Entry?
25 8. Does everyone understand that as a juror you are not to consider prejudice, pity, or
26 sympathy in deciding whether the defendant is guilty or not guilty?
27
28

9. The Court is responsible for determining and imposing a fair sentence if a defendant is found guilty. Will you be able to set aside any consideration of the sentence in deciding the facts of this case?

## **CONCLUSION**

The Government submits this Trial Memorandum to inform the Court on the nature of the case and applicable law.

DATED: January 17, 2018                    Respectfully submitted,

ADAM L. BRAVERMAN
United States Attorney

*/s/ Ryan R. Crosswell*
RYAN R. CROSSWELL
Assistant United States Attorney

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> KARINA LIZETH RAMIREZ, <br><br> Defendant. | Case No. 3:17-cr-03955-LAB <br> Related Case No. 3:17-cr-02574-LAB <br><br> **CERTIFICATE OF SERVICE** |

IT IS HEREBY CERTIFIED THAT:

I, Ryan R. Crosswell, am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

I am not a party to the above-entitled action. I have caused service of the attached document, on the following parties by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Ricardo Gonzalez, Esq., Attorney for Defendant Karina Lizeth Ramirez

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 17, 2018

*/s/ Ryan R. Crosswell*
RYAN R. CROSSWELL
Assistant United States Attorney